Larry NEVERS, Petitioner,

v.

George KILLINGER, Warden of FMC Fort Worth, Fort Worth, Texas; Kenneth McGinnis, Director of the Michigan Department of Corrections Michigan Department of Corrections, Respondents.

No. 97–CV–75175–DT.

United States District Court, E.D. Michigan, Southern Division.

Dec. 30, 1997.

ted).

Neil H. Fink, David A. Koelzer, Birmingham, MI, for Larry Nevers.

Olga Agnello–Raspa, Timothy A. Baughman, Wayne County Prosecutor's Office, for George Killinger.

## MEMORANDUM OPINION AND ORDER

ZATKOFF, District Judge.

### I. INTRODUCTION

This matter is before the Court on Petitioner's Request for a Writ of ·Habeas Corpus. Respondent filed a response, and Petitioner has elected not to reply. On December 22, 1997, a hearing was held at which the Court heard oral argument from both parties. For the reasons set forth below, Petitioner's Request for a Writ of Habeas Corpus is granted.

### II. BACKGROUND

The facts of this case have been recounted numerous times and need not be repeated in their entirety. Therefore, only a brief overview of pertinent facts is required for the purposes of this Court's opinion. Petitioner Nevers (hereinafter "Petitioner" or "Nevers") was a police officer with the Detroit Police Department. He was on duty with former Detroit Police Officer Walter Budzyn (hereinafter "Budzyn") when the incident occurred that resulted in Malice Green's (hereinafter "Green") death. Both were tried and convicted by different juries in Detroit Recorder's Court.

At approximately 10:15 p.m. on November 5, 1992, Petitioner was patrolling in the City of Detroit in plain clothes and in an unmarked car with Budzyn. They observed a Topaz, driven by Green with bullet holes in the front passenger door. Petitioner testified that he saw the car pull up in front of a house known for drug activity. The house was occupied by Robert Fletcher (hereinafter "Fletcher"). Robert Hollins (hereinafter "Hollins") and Teresa Pace (hereinafter "Pace"), witnesses to the event, were present at Fletcher's house and had been smoking cocaine that evening. Budzyn and Nevers stopped the Topaz to investigate. Budzyn testified that he saw Robert Knox (hereinafter "Knox") running next to the building and chased him because he believed that Knox was in the car with Green. Budzyn eventually caught up to Knox and patted him down for weapons. He also patted down Fletcher, who had been in the car with Green. Petitioner asked Green for his driver's license. Green did not respond to Petitioner's request but walked around to the passenger side of the car and got in. Budzyn followed him and again asked Green to see his driver's license. After Green opened the glove compartment, something fell to the floor of the car. Green grabbed it and Budzyn asked him to let go of what was in his hand. Green refused.

At this point, there is substantial disagreement in the testimony given by defendants and that given by the civilian witnesses to the incident, Brown, Knox, Pace, and Hollins. The five civilian witnesses testified that after Green refused to open his hand, Budzyn began to hit him on the hand with the police flashlight in an effort to force him to open his hand. According to the civilian witnesses, Budzyn then climbed on top of Green who did not comply with orders to open his hand. Fletcher and Pace testified that although they did not see the blows land, from the position on which Budzyn was straddling Green, he must have been hitting him on the head.

The five witnesses also testified that while Budzyn was struggling with Green in the car, Petitioner struck Green on his knee several times. Brown and Fletcher then testified that petitioner went around the car to the driver side, opened the door and struck Green in the head with his flashlight.

In contrast to the civilian testimony, Petitioner testified that he assisted Budzyn when Green resisted Budzyn's efforts to open his hand. Petitioner explained that he only hit Green on the knees after Green kicked his knees up to stop petitioner from prying open his hand. Petitioner then went to the other side of the car after Budzyn told him that

Green was trying to escape out the driver's side. Petitioner testified that he only struck Green in the head after Green grabbed for his gun and stopped hitting after Green let go of his gun. Petitioner flagged down an Emergency Medical Service (hereinafter "EMS") vehicle which happened to be driving by. During the struggle with Green, Petitioner testified he saw something "shiny" in Green's hand. Petitioner again struck Green on the head, fearing that the shiny object was a razor blade or knife. Petitioner admitted that during the struggle, he struck Green on the head five or six times with his flashlight.

The EMS workers arrived in two vehicles. Albino Martinez (hereinafter "Martinez") and Mithyim Lewis (hereinafter "Lewis") arrived first followed by Lee Hardy (hereinafter "Hardy") and Scott Walsh (hereinafter "Walsh"). In response to an Officer in Distress call made by either Petitioner or Budzyn, several marked police cars arrived soon after the EMS vehicles. All four of the EMS workers testified that Petitioner struck Green in the head repeatedly even though Green was not offering any significant resistance. Martinez and Walsh testified that Petitioner ordered Green to sit still and open his hands and when he did not, petitioner struck him with the flashlight. Martinez and Lewis testified that Petitioner hit Green four times with the flashlight, while Hardy testified that Petitioner hit Green approximately ten times in the head. Green finally released the car keys he held in one hand and a piece of white paper used for rolling rock cocaine, he held in the other hand. The uniformed officers then handcuffed Green as he continued to struggle. The EMS workers began rendering care to Green. Green suffered a seizure and, soon after, died.

The people presented Dr. Kalil Jiraki (hereinafter "Dr. Jiraki"), an assistant Wayne County Medical Examiner, who testified that Green died from blunt force trauma to his head and that he suffered at least fourteen blows to the head. Dr. Jiraki also explained that Green had .5 micrograms of cocaine in his system, indicating he was under the influence of cocaine at the time of his death. Dr. Jiraki testified that the cocaine had no bearing on Green's death. In response, defendants presented three pathologists, each of whom testified that the cocaine played a greater role in Green's death.

Petitioner was charged with second-degree murder along with Budzyn. A barrage of media publicity began immediately after the incident and continued unabated until the trial began. The incident occurred soon after a suburban jury acquitted four white Los Angeles police officers who had been videotaped beating black motorist Rodney King. The acquittal set off a riot in Los Angeles that drew national attention. The media frequently compared the Green incident to the events in Los Angeles. The Detroit Police Department fired all of the officers at the scene before trial and before any investigation.[1] The City of Detroit almost immediately agreed to a multimillion dollar settlement with Green's estate. In response to criticism about the settlement, a city attorney stated that the generous settlement might spare Detroit from the same type of riot that burned Los Angeles.

Defendants moved to sever the trials. The trial court refused to separate the proceedings, but did grant defendants' motion for separate juries. Petitioner asked for a change of venue because of the extensive and prejudicial pretrial publicity. However, the trial court denied his motion. The trial court began the voir dire on June 2, 1993 and the trial began on June 18, 1993. During a recess near the end of the trial, the trial court provided the juries with a number of videos to watch during the time they were not in court. One of the movies provided was Malcolm X. The film begins with the video of the Los Angeles police officers beating Rodney King. The video of the beating is replayed eight times while a speech by Malcolm X is heard in the background. Defendants moved for a mistrial on this basis, but the motion was denied.

---

1. The city even fired those officers whom merely responded to the Officer in Distress call. Paul Gotelaere, Karl Gunther, and James Kijek later filed suit claiming the City of Detroit, Chief Knox, and Mayor Young violated their civil rights by firing them before any investigation. A jury returned a multimillion dollar verdict in favor of the officers. *Gotelaere, et al v. City of Detroit et al*, 93–CV–74598–DT.

The trial lasted for approximately seven weeks and was televised gavel to gavel on Court TV. The television coverage included daily commentary by various "legal experts." [2] The juries began deliberating on August 13, 1993. After nine days of deliberations, the jury convicted Petitioner of second-degree murder. The jury also convicted Budzyn of second-degree murder after eight days of deliberations. Petitioner was sentenced to twelve to twenty-four years in prison and Budzyn was sentenced to eight to eighteen years. Defendants moved for a new trial, but the trial court denied this motion.

On appeal, the Michigan Court of Appeals consolidated the defendants appeals and affirmed the convictions in an unpublished opinion per curiam, issued March 22, 1995. Petitioner filed his Application for Leave to Appeal in the Supreme Court of Michigan in April, 1995. The Michigan Supreme Court took over one year to decide whether to hear the appeal and finally granted leave on May 7, 1996. After deciding to hear the appeal, the Supreme Court took another year to decide the case. Twenty-seven months after the appeal was filed, the Supreme Court issued an opinion on July 31, 1997. In *People v. Budzyn*, 456 Mich. 77, 566 N.W.2d 229 (1997), the court reversed Budzyn's conviction and remanded his case for a new trial. The Supreme Court found that the constitutional rights of both Petitioner and Budzyn had been violated. However, the Supreme Court affirmed Petitioner's conviction because they found overwhelming evidence of his guilt. *Id.* at 108, 566 N.W.2d at 243.

After exhausting state remedies, Petitioner filed a Request for a Writ of Habeas Corpus under 28 U.S.C. § 2254 on October 8, 1997.

### III. STANDARD OF REVIEW

State prisoners may seek federal habeas corpus relief on the grounds that they are being held in custody in violation of the United States Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). Because Petitioner's application was filed after April 26, 1996, his petition is governed by the provisions of the recently enacted Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. No. 104–132, 110 Stat. 1214 (1996) ("AEDPA"). The AEDPA has significantly amended the habeas statute and sets forth new standards of review for federal courts to apply when addressing petitions for writs of habeas corpus.[3] *See* 28 U.S.C. § 2254(d)(1); *Harpster v. State of Ohio*, 128 F.3d 322 (6th Cir.1997); *Ford v. Ahitow*, 104 F.3d 926, 936 (7th Cir.1997). These new standards are codified in amended 28 U.S.C. § 2254(d), which provides as follows:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.*

Thus, federal courts must deny a petition for writ of habeas corpus unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Under this stricter standard, federal courts must now "give greater deference to the determinations made by state courts than they were re-

---

**2.** This case presents a prime opportunity for the Michigan Supreme Court to review the decision allowing cameras in court. Suggestions that televised trials educate the public are disingenuous. The goal is not education but sensationalism and profit. To be sure, what we must be most concerned about is the defendant's right to a fair trial, not entertainment.

**3.** Surprisingly, although the amendments effectuated by the AEDPA clearly apply to the case at bar, neither Petitioner nor Respondent addresses, in any significant detail, the requirements or ramifications of the new statute and the relevant standards of review.

quired to do under the previous law." *Spreitzer v. Peters,* 114 F.3d 1435, 1441 (7th Cir.1997). In addition, the language of the new § 2254(d)(1) which references "clearly established Federal law, as determined by the Supreme Court of the United States", appears to require that the federal courts are restricted to the case law of the Supreme Court of the United States in reviewing a petitioner's habeas claim and may no longer apply their own precedent. *Lindh v. Murphy,* 96 F.3d 856, 870 (7th Cir.1996), *rev'd on other grounds,* —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Sweeney v. Parke,* 113 F.3d 716, 718 (7th Cir.1997); *But see Lindh v. Murphy,* 96 F.3d 856, 885–89 (7th Cir.1996) (Ripple, J. dissenting) (arguing that such a requirement is unconstitutional), *rev'd on other grounds,* —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997).

Thus, § 2254(d) and its new standards of review govern this Court's decision whether habeas relief is appropriate in this case. Although the Sixth Circuit has not yet decided how to implement these new standards of review, the Court is guided by the Sixth Circuit's opinion in *Harpster v. State of Ohio,* 128 F.3d 322 (6th Cir.1997), which outlines two slightly different approaches developed by other circuits.

In *Harpster,* the Court explained that the first approach, followed by the Fifth and Seventh Circuits, requires a federal court to first determine whether the petitioner challenges a question of law, a question of fact, or a mixed question of law and fact. *Harpster v. State of Ohio,* 128 F.3d 322, 326 (6th Cir.1997); *Drinkard v. Johnson,* 97 F.3d 751, 767–68 (5th Cir.1996) *cert. denied,* —— U.S. ——, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997); *Lindh v. Murphy,* 96 F.3d 856, 870 (7th Cir.1996), *rev'd on other grounds,* —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Thereafter, "[t]he categorization of the disputed issue determines which part of § 2254(d) applies." *Harpster v. State of Ohio,* 128 F.3d 322, 326 (6th Cir.1997).

Under this categorization approach, if the challenge involves only a question of fact, § 2254(d)(2) applies and the federal court can grant habeas relief only "if the state court's decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceed-

ing.' " *Harpster v. State of Ohio,* 128 F.3d 322, 326 (6th Cir.1997) (quoting *Drinkard v. Johnson,* 97 F.3d 751, 767–68 (5th Cir.1996)) *cert. denied,* —— U.S. ——, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997). Moreover, a state court determination of a factual issue is to be presumed correct and the petitioner can rebut the presumption only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

If however, a petitioner challenges a decision based only on a question of law, then the first clause of § 2254(d)(1) applies and "a federal court may grant habeas relief only if it determines that a state court's decision rested on a legal determination that was 'contrary to ... clearly established Federal law, as determined by the Supreme Court.' " *Id.*

Lastly, if the challenge is one that presents a mixed question of law and fact, then the second clause of § 2254(d)(1) applies and a federal court should grant habeas relief only if the state court decision was "an unreasonable application of ... clearly established Federal Law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Harpster v. State of Ohio,* 128 F.3d 322, 326 (6th Cir.1997); *Drinkard v. Johnson,* 97 F.3d 751, 767–68 (5th Cir.1996) *cert. denied,* —— U.S. ——, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997). The new § 2254(d)(1) deferential review for reasonableness is only required on mixed questions of fact and law. *Gomez v. Acevedo,* 106 F.3d 192, 198–199 (7th Cir.1997). Mixed questions of law and fact are those decisions which require the application of a legal standard to fact determinations. *Thompson v. Keohane,* 516 U.S. 99, 109–11, 116 S.Ct. 457, 464, 133 L.Ed.2d 383 (1995).

The Sixth Circuit in *Harpster* also set out a contrary approach adopted by the First Circuit in *Martin v. Bissonette,* 118 F.3d 871 (1st Cir.1997). The Court explained the First Circuit's approach as follows:

> Guided by the "contrary to" clause of § 2254(d)(1), the court first determines whether clearly established Supreme Court precedent provides a rule that compels an outcome to the issue at hand. If Supreme Court precedent provides no such rule, the court then determines

whether the state court decision "involved an unreasonable application" of Federal law as established by the Supreme Court. Under the First Circuit approach, therefore, courts need not classify disputed questions into either questions of law or mixed question of law and fact.

*Harpster v. State of Ohio,* 128 F.3d 322, 327 (6th Cir.1997).

After setting forth the two approaches, the *Harpster* Court remarked that although the First Circuit approach was different, it "probably will not lead to different results." *Id.* The Court found that difference between the two approaches held little significance in the case before it because there was not Supreme Court precedent providing a rule to compel the outcome, and, the question presented—whether there was manifest necessity for the state trial judge to declare a mistrial—was one that involved a mixed question of fact and law. *Id.* Accordingly, under either approach the result was the same and the Court's inquiry was whether the state court decision "involved an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court." *Id.*

■ Although the Sixth Circuit did not explicitly address which approach it would follow, other Courts that have considered the subject have approved of the Fifth Circuit's categorization approach. *See Lindh v. Murphy,* 96 F.3d 856, 870 (7th Cir.1996), *rev'd on other grounds,* — U.S. —, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Moore v. Calderon,* 108 F.3d 261, 265 n. 3 (9th Cir.1997) *cert. denied,* — U.S. —, 117 S.Ct. 2497, 138 L.Ed.2d 1003 (1997). In contrast, the approach taken by the First Circuit, and outlined by the Sixth Circuit in *Harpster,* has not been adopted by any other courts. In fact, the case in which the First Circuit sets forth their approach, *Martin v. Bissonette,* *118 F.3d 871* (1st Cir.1997), was apparently withdrawn. The opinion which superseded it does not contain any reference to the approach as discussed by the Sixth Circuit in *Harpster. See Martin v. Bissonette,* 118 F.3d 871 (1st Cir.1997); *Harpster,* 128 F.3d

322, 327 (6th Cir.1997). Therefore, based on the above, the Court finds that the categorization method is the approach the Sixth Circuit would adopt, and the applicable standard of review is guided by whether the petition presents a question of law, a question of fact, or a mixed question of law and fact.[4]

Although the parties in this case did not address the requirements of the new habeas statute, the asserted errors that the Court will address all involved mixed questions of law and fact and hence, allegedly unreasonable applications of federal law. *See Dickson v. Sullivan,* 849 F.2d 403, 405–406 (9th Cir. 1988) (whether extrinsic evidence introduced to jury was prejudicial and violated 6th amendment is mixed question of law and fact); *Suniga v. Bunnell,* 998 F.2d 664, 667 (9th Cir.1993) (harmlessness is mixed question of law and fact); *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1643, 6 L.Ed.2d 751 (1961) (issue of venue is mixed question of fact and law. *See, e.g., Rodriguez v. Marshall,* 125 F.3d 739, 744 (9th Cir.1997); *Orndorff v. Lockhart,* 998 F.2d 1426, 1432 (8th Cir.1993); *Thompson v. Leeke,* 590 F.Supp. 110, 112–13 (D.S.C.1984).

Accordingly, the Court finds that the applicable standard of review is that provided by the second clause of § 2254(d)(1), specifically, whether the state court decision(s) "[i]nvolved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

However, the Court's inquiry does not end here. The question remains: what constitutes an unreasonable applicable of clearly established Federal Law? The Sixth Circuit has not yet addressed this, or any other question involving the new standards of review enacted by the AEDPA. Therefore, the Court will examine the few decisions outside this circuit that have addressed the issue.

Currently, the precise contours of 'unreasonable application' are still being debated. *Compare Drinkard v. Johnson,* 97 F.3d 751, 768–69 (5th Cir.1996) *cert. denied,* — U.S.

---

**4.** Even if the Court were to adopt the approach apparently set forth by the First Circuit in *Martin,* the result would be the same. This is because, as in *Harpster,* there is not Supreme Court

precedent providing a rigid rule to compel the outcome(s) and the issues are ones that involve mixed questions of fact and law. *Harpster,* 128 F.3d 322 (6th Cir.1997).

——, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997), with *Lindh v. Murphy,* 96 F.3d 856, 870–72 (7th Cir.1996), *rev'd on other grounds,* —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997) and *Hennon v. Cooper,* 109 F.3d 330, 335 (7th Cir.1997).

In the Fifth Circuit's discussion of what constitutes an unreasonable application, they stated:

This "unreasonable application" standard of review of a state court decision must mean more than that a federal court may grant habeas relief based on its simple disagreement with the state court decision. . . . The use of the word "unreasonable" in formulating this restrictive standard of review implicitly denotes that federal courts must respect all reasonable decisions of state courts. . . . we hold that an application of law to facts is unreasonable only when it can be said that reasonable jurists considering the question would be of one view that the state court ruling was incorrect. In other words, we can grant habeas relief only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.

*Drinkard v. Johnson,* 97 F.3d 751, 768–69 (5th Cir.1996) *cert. denied,* —— U.S. ——, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997).

It appears that the Ninth Circuit may approve of the *Drinkard* standard as well. *See Jeffries v. Wood,* 114 F.3d 1484, 1500 (9th Cir.1997); *Johnson v. Gomez,* 1997 WL 703770, *5 (N.D.Cal., Oct.28, 1997) (No. C 96–2913 CAL); *Holdsworth v. Lindsey,* 1997 WL 573417, *3 (N.D.Cal., Sept.2, 1997) (No. C 97 09*36 VRW(PR)); *Cf., Mitchell v. Prunty,* 107 F.3d 1337, 1339–40 n. 3 (9th Cir.1997) (one factor to consider in determining whether application of law is reasonable is the importance of the issue on review), *cert. denied,* —— U.S. ——, 118 S.Ct. 295, 139 L.Ed.2d 227, (1997).

On the other hand, the Seventh Circuit has stated that the "criterion of a reasonable determination is whether it is . . . . at least minimally consistent with the facts and circumstances of the case." *Hennon v. Cooper,* 109 F.3d 330, 335 (7th Cir.1997). While recognizing that the standard allows state court determinations to stand if it is one of several equally plausible outcomes, *Hall v.*

*Washington,* 106 F.3d 742, 748–49 (7th Cir. 1997), the Seventh Circuit also stated that:

[C]ongress would not have used the word "unreasonable" if it really meant that federal courts were to defer in all cases to the state court's decision. Some decisions will be at such tension with governing U.S. Supreme Court precedents, or so inadequately supported by the record, or so arbitrary, that a writ must issue.

*Id.*

The Seventh Circuit has stated that "the care with which the state court considered the subject" is important. *Lindh v. Murphy,* 96 F.3d 856, 871 (7th Cir.1996), *rev'd on other grounds,* —— U.S. ——, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). "[A] responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment." *Id.*

In *Drinkard,* the Fifth Circuit, using the "reasonable jurists considering the question would be of one view that the state court ruling was incorrect" standard held that because two of the judges on the three-judge panel "unequivocally concluded that the instruction at issue did not [violate the constitution]" and the third judge dissented, concluding that the instruction was indeed a violation, it therefore followed that the issue was one that was debatable among reasonable jurists and, hence, the state court determination was not an unreasonable application. *Id.* at 769. Specifically, the Court stated: "It follows that when jurists considering the state court ruling disagree in this manner, the application of the law by the state court is not unreasonable." *Id.*

Stripped bare, the *Drinkard* standard is one that conceivably requires unanimity before habeas relief can be ever be granted. Clearly Congress intended to enact tougher standards for habeas review, however, the Fifth Circuit's articulation of an unreasonable application cannot be the standard required under the new 2254(d)(1). Taken to the extreme, what is the result commanded when two Circuit judges find a state court determination to be an unreasonable application of law, but, the third judge dissents and concludes that it was perfectly reasonable? Must the dissenting judge be deemed an

unreasonable jurist, or, must the court conclude that the state court ruling was not an unreasonable application of federal law because it is debatable among reasonable jurists? This would seem to be the result required by *Drinkard* if the appropriate standard is that a federal court may grant habeas relief "only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists." *Id.* 769.

Moreover, a standard of reasonableness which looks to see whether the issue is 'debatable among reasonable jurists', in order to determine its constitutionality is unreasonable in and of itself. In reality, how would a federal district court, sitting alone, apply such a standard? Isn't any determination by a federal habeas court that the state court unreasonably applied federal law a disagreement among 'reasonable jurists'? Such a requirement, as articulated by the Fifth Circuit, is difficult to apply and presents too high a hurdle on habeas review, one which it could be argued every petition would fail to meet. Thus, the Court finds that it is not the appropriate standard under § 2254(d)(1). Therefore, the Court declines to follow the approach set forth by the Fifth Circuit.

 Rather, the Court is guided by the Seventh's Circuit approach that a reasonable determination is one which is "consistent with the facts and circumstances of the case." *Hennon v. Cooper*, 109 F.3d 330, 335 (7th Cir.1997). Keeping in mind that the federal courts are not to defer entirely to the state court determination. *Hall v. Washington*, 106 F.3d 742, 748–49 (7th Cir.1997). It is up to the federal courts to determine, in light of the facts and the applicable law, whether the state court decision was reasonable. In this regard the Court finds particularly appropriate the words of Judge Garza who dissented in the Fifth Circuit's *Drinkard* opinion. Judge Garza stated:

> The majority continues by stating that an application of law to facts is unreasonable only where "reasonable jurists would be of one view that the state court ruling was incorrect." This cannot be the standard of review. Where a federal court of appeals determines that a state criminal decision is contrary to federal law, § 2254(d)(1) does not require the unanimous consent of the

federal bench for habeas relief. Indeed, it does not even require unanimity among a panel of judges considering the case. *The determination of reasonableness must consider only the propriety and correctness of the state court's actions in the context of federal guarantees established by the Supreme Court. If a federal court "disagrees" with the state court's application of federal law—if it finds that the state court unreasonably applied the law of the land—that federal court must grant habeas relief under § 2254(d)(1).*

*Drinkard v. Johnson*, 97 F.3d 751, 779 (5th Cir.1996) (Garza, J., dissenting) *cert. denied*, — U.S. ——, 117 S.Ct. 1114, 137 L.Ed.2d 315 (1997) (emphasis added).

Accordingly, this Court rejects the standard for determination of unreasonable application as set forth by the majority in the Fifth Circuit's *Drinkard* opinion, and as seemingly adopted by the Ninth Circuit as well, for the reasons set forth above. Rather, the standard that will guide this Court is that set forth by Seventh Circuit, as well as that embodied in Judge Garza's dissent quoted above.

## IV. OPINION

At the outset, it is important to note what this case is not about. Specifically, the guilt or innocence of Petitioner Larry Nevers in connection with the death of Malice Green is not at issue in this case. What is at issue is the question of whether the Petitioner was afforded his constitutional right to a fair trial. Although this issue necessarily arises from the state court criminal proceedings, it is a separate and distinct issue from that of his guilt or innocence. Accordingly, this Court's decision in this matter should not be taken as an implicit, or explicit, opinion on the ultimate question of Petitioner's guilt, or lack thereof.

### A. CHANGE OF VENUE

 The standards governing change of venue derive from the Fourteenth Amendment's due process clause, which safeguards a defendant's Sixth Amendment right to a fair trial by "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81

S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). The trial court may be unable to seat an impartial jury because of prejudicial pretrial publicity or an inflamed community atmosphere. In such a case, due process requires the trial court to grant defendant's motion for a change of venue or a continuance. *Rideau v. Louisiana*, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (1963); *see also Sheppard v. Maxwell*, 384 U.S. 333, 362–63, 86 S.Ct. 1507, 1522, 16 L.Ed.2d 600 (1966). "It is not required, however, that the jurors be totally ignorant of the facts and issues involved." *Irvin v. Dowd*, 366 U.S. at 722, 81 S.Ct. at 1642. The central issue is the fundamental fairness of the defendant's trial. *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975). The Supreme Court has established two standards to guide courts, the "actual prejudice" standard and the "presumed prejudice" standard. Because this Court finds the presumed prejudice standard dispositive, I will not address the actual prejudice standard.

Prejudice is presumed where pretrial publicity is so pervasive and inflammatory as to saturate the community where the trial was held. *Rideau*, 373 U.S. at 726–27, 83 S.Ct. at 1419–20; *Murphy*, 421 U.S. at 798–99, 95 S.Ct. at 2035; *see also Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). Although application of the presumed prejudice standard is "relatively rare", where a defendant brings forth evidence of inflammatory and prejudicial pretrial publicity that so pervades the community so as to render virtually impossible a fair trial by an impartial jury drawn by that community, jury prejudice is presumed and there is no further duty to establish bias. *Rideau*, 373 U.S. at 727, 83 S.Ct. at 1419. Moreover, adverse pretrial publicity can create such a presumption of prejudice that the jurors' claims that they can be impartial should not be believed. *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2888, 81 L.Ed.2d 847 (1984); *see also Sheppard v. Maxwell*, 384 U.S. 333, 351, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966).

Because the question whether the pretrial publicity was so pervasive that prejudice should be presumed is by its very nature shaped by the facts, this Court begins by reviewing the two key Supreme Court cases on the issue. In *Rideau*, the Supreme Court found that prejudice was presumed from pretrial publicity and no other outside influences. The defendant confessed to robbing a bank in Calcasieu Parish, Louisiana, kidnaping three of the bank's employees, and killing one of them. The defendant's confession was videotaped and subsequently broadcast three times by a local television station. The three broadcasts were seen by approximately 110,000 people in the community. At trial, the court denied defendant's motion for a change of venue. The United States Supreme Court held that this denial violated the due process clause. Although the Court noted that three jurors who decided the case had seen the televised confession, the Court presumed that the defendant was prejudiced "without pausing to examine a particularized transcript of the voir dire examination of the members of the jury." *Id.* at 727, 83 S.Ct. at 1419. According to the Supreme Court, the televised confession was "Rideau's trial," and "[a]ny subsequent proceedings in the community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* at 726, 83 S.Ct. at 1419.

Another important case dealing with presumed prejudice is *Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). In *Murphy*, the Supreme Court held that the defendant was not deprived of due process when the trial court denied his motion for change of venue. The defendant was convicted in 1970 of offenses related to a robbery that took place in January 1968. In 1968 and 1969, defendant was indicted for murder in another county, declared mentally incompetent, indicted on a federal conspiracy charge, and later declared competent. The local newspaper extensively publicized the above events along with the defendant's participation in the 1964 theft of the Star of India sapphire. The Court rejected defendant's presumed prejudice claim, however, finding that there was no inflamed community atmosphere. The Court also placed great weight on two major factors: (1) the seven to twenty month lapse of time between the time the newspapers printed the articles com-

plained of and jury selection; and (2) the articles printed were "largely factual in nature." *Murphy,* 421 U.S. at 802, 95 S.Ct. at 2037.

With this background, we consider petitioner's claim that the pretrial publicity was so pervasive that it saturated the city of Detroit. Because the presumed prejudice standard requires an extensive evidentiary showing of pretrial publicity to warrant habeas relief, a thorough discussion of the circumstances leading up to the trial is required.

## 1. PERVASIVE PRETRIAL PUBLICITY

Although the "firestorm of media publicity" came from both print and television, newspaper coverage constitutes the most significant source of pretrial publicity on the record. *See People v. Budzyn,* 456 Mich. at 86, 566 N.W.2d at 234. Petitioner includes with his brief over 162 articles related to the Green incident printed in the media between the incident on November 5, 1992 and the trial on June 4, 1993. The Detroit News and The Detroit Free Press were and still are the most widely circulated newspapers in the metropolitan Detroit area.

The news coverage was immediate and immense. The combined edition of the Detroit News and Free Press on Saturday, November 7 contained at least six articles devoted to the Green incident. The front page headline read, "Fatal beating by police outrages city leaders." The article included the first reference to the nickname given to Petitioner and Budzyn. Apparently, the two were known as "Starsky and Hutch," a reference to their reputation as hard line police officers. The article also quoted Petitioner who stated shortly after the incident: "I must have done something wrong, a guy died." Exh. M24. Police Chief Stanley Knox (hereinafter "Chief Knox") immediately announced the suspensions without pay and without investigation of the seven officers at the scene in an effort "to prevent the violence that rocked Los Angeles after officers charged with beating [Rodney] King were acquitted." Exh. M24. During a press conference held the day after the incident, Chief Knox announced "[t]his type of thing will not be tolerated." Exh. M24.

The front page article also contained information from an anonymous police official who told the press that more than twenty-five complaints were lodged against Petitioner and Budzyn, although none were sustained. The article also stated that Nevers was a member of STRESS (Stop the Robberies Enjoy Safe Streets), a controversial undercover unit that was involved in alleged harassment of young black men before it was disbanded by Former Detroit Mayor Coleman Young (hereinafter "Mayor Young"). Exh. M25. The article included information that Nevers was involved in the shooting death of a Detroit woman in which no charges were filed. According to the newspaper, Nevers had been sued at least twice, including a case where he and another cop beat a Detroit man in a restaurant parking lot which the city settled for $6,000. Exh. M25. The article also quoted a number of neighborhood residents who commented on the reputations of Budzyn and Petitioner in the community.

> Nevers and Budzyn are well known in the bleak neighborhood where Green died.
>
> 'Everybody knows them as Starsky and Hutch,' [a Detroit resident] said. 'They harass people. I mean, this is the first time I seen [sic] them do anything like that'
>
> . . . . .
>
> 'They were real hard on a lot of people, real hard,' [a Detroit resident] said of [Budzyn and Nevers].
>
> 'It's not a place in jail for them,' [Malice Green's mother] said through red eyes. 'They need to get the electrical chair.... They just beat him unmercifully. If I had my say, they'd be right where my son is.'

Exh. M25.

Another article in the November 7 Detroit News and Free Press entitled "Abuse of power an old problem" compared the Green incident to incidents that occurred during the 1970's when "[t]he police department was more like an occupying force than a public servant." Exh. M16 (quoting City Councilman Keith Butler). The article specifically referred to the officers involved in STRESS as major culprits of police brutality and stat-

ed that the controversial unit was involved in the deaths of twenty people, seventeen of whom were black.

Also in the November 7 Detroit News and Free Press was an article entitled "Officials demand unbiased investigation" which quoted then City Council President Maryann Mahaffey (hereinafter "Mahaffey"). "This is so hurtful ... It hurts everyone. . Yes, the family. Yes, the friends. No matter who they are or where they come from, it hurts us all when people are unprofessional and engage in brutality." Exh. M21. The article also compared the Green incident to the Rodney King incident in Los Angeles. However, Edward Littlejohn, a Wayne State University Law School Professor who was appointed by Mayor Coleman Young to the police commission in 1973, stated that Green is not likely to become the next Rodney King, whose attackers were acquitted by a suburban jury. If the case goes to trial, *"you're going to have a different jury composition ... You'll get a different result than Rodney King."* Exh. M21 (emphasis added).

Another article in the November 7 edition of the Detroit News and Free Press entitled "Young sees achievement of justice tarnished" quoted Mayor Young who referred to Petitioner and Budzyn by their now famous nicknames. "Starsky and Hutch in Detroit, I just didn't think it could happen." Exh. M23. Mayor Young also called for a more careful examination of police records to prevent those officers with a record of violence from serving in the community. Exh. M23.

Also on November 7, an article entitled "Racial aspect: Cases are similar, responses different" included the comments of NAACP president Arthur Johnson and other local leaders:

'Police brutality and the killings of black men has been part of police work in every section of the nation.... I think people see racism in this incident because the killing took place in that frame.' [Johnson] said.

And local NAACP Executive Director Joann Watson said the police department still has 'holdovers from STRESS' a controversial crime prevention program of the early 1970's that was widely interpreted as racist. More than 20 people, most of them black were killed by STRESS officers in its 2½-year existence. Larry Nevers, one of the officers who allegedly inflicted the fatal blows in Green's killing was a member of the unit.

Exh. M27.

On Sunday, November 8, 1992, the front page headline was "Mom says victim used drugs but 'he was not a violent person.'" Exh. 29. According to the article, Green was a hardworking young man who had troubles with drugs and hoped to be reunited with his estranged wife, two daughters and three step children. The story concluded:

As Patricia Green tries to sort out the murky circumstances behind her son's death, she is clear about one thing: She wants justice from the Detroit Police Department.

'They are going to pay. They are going to have to pay dearly,' Green said. 'There's no way they are going to get away with this.'

Exh. M29.

Another article in the November 8 edition was headlined "Accused cops are feared on the streets" and explained the reason behind the nicknames given to Petitioner and Budzyn.

They were known in the neighborhood as "Starsky and Hutch"—maverick cops, tough-and-tumble, who used an elbow, a fist, or a threatening remark as tools of persuasion.

In TV land, Starsky and Hutch played to hand-clapping reviews in the 1970s as renegade officers who operated by their own rules. But in a southwest Detroit neighborhood, plainclothes cops Larry Nevers and Walter Budzyn were far from a hit, chasing people off street corners and rousting crack heads, dope dealers, hookers and law-abiding citizens alike, residents say.

'I'm no angel, and they beat my ass before, but nothing like this,' said area resident Michael Jackson, commenting on Thursday's fatal beating of Malice Green. 'You might be standing on the corner. If he tells you to get off the corner, you don't f—— with him.'

'You can't disrespect the police (because) they got a license to kill.'

. . . . .

The death of Green could be the final episode on the force for Nevers, 52, a 24–year veteran, and Budzyn, 42, a Detroit cop for the past 19 years. . The two were immediately suspended from the force. They may face criminal charges.

Exh. M32.

The article also described previous incidents involving Nevers and Budzyn. For example, in 1991, 22–year–old Robert Clark (hereinafter "Clark"), a 140–pound diabetic, filed a lawsuit against the two officers in Wayne County Circuit Court. In the suit, Clark alleged that he was waiting in a car while two associates tried to break into a car near Tiger Stadium. According to the article, Nevers yanked him out of the car while he was still in his seat belt and began to punch him repeatedly, threw him down to the pavement, and broke his arm. The two officers denied any wrongdoing. However, the city settled with Clark for nuisance monetary damages between $5,000 and $10,000. In another incident, Nevers and four other members of the STRESS unit were named in a lawsuit in 1973, which alleged that police used unnecessary force when they killed a 26–year–old woman in a robbery of a Kentucky Fried Chicken.

The article also mentioned two other incidents in which Petitioner was allegedly involved. In 1972, Nevers shot and wounded a 15–year–old boy who apparently broke into a gas station on West Fort. The newspaper also linked Nevers to another widely publicized police brutality case in Detroit.

Nevers' former partner, John Pawlak, was convicted of manslaughter in one of Detroit's most sensational police brutality cases.

In 1980, Pawlak beat a black prisoner to death after the two exchanged racial slurs. Others tried to revive the man with an electronic cattle prod.

Nevers, who did not witness the incident, defended Pawlak: 'You get called all kinds of names on the street. You ignore it. We're not out to battle people, and John realized that. But if someone takes a swing at you, you've got to defend yourself.'

In all, during the course of their careers, Nevers and Budzyn have been the subject of 25 complaints, an internal affairs officer said. However, none was [sic] ever sustained.

Nevers and Budzyn teamed up in the 3rd Precinct eight years ago.

The twosome used fear to gain respect in the neighborhood, residents said.

Exh. M33.

Another headline in the November 8, 1997 edition of the Detroit News and Free Press read "Police move quickly to find officers in Green beating death." The article described how Chief Knox placed the seven suspended officers in a lineup and brought in witnesses to identify those responsible for the beating. The story also noted the reactions shared by some Detroit Police Officers at the quick suspensions meted out by Knox. " 'Some officers are angered at Chief Knox's conduct,' added Officer David Malhalab, of the 6th Precinct. 'Nobody likes a dirty or brutal cop, but the chief has already convicted some men before there's been an investigation.' " Exh. M36. The article again mentioned the police officers reputation in the community.

Some residents in the 3rd Precinct, where Nevers and Budzyn patrolled, said the beating death was an extreme form of police brutality they frequently witness.

'It got too easy for them to rough people up,' said one officer close to the investigation. 'They had been doing it, and getting away with it, for too long.'

Exh. M36.

The news of the incident continued on November 9, 1992 with a headline in the Detroit Free Press that read, "Brass blamed in city beatings." The article reported that Detroit residents are beaten by rogue cops because police executives have repeatedly failed to take strong measures to eradicate brutality. The story also shared the results of a Detroit Free Press study of penalties meted out to police officers. In 1989, every officer found guilty of using cocaine was terminated. However, more than half of the officers found to have engaged in brutality

were not immediately punished "to give them a chance to reform." Exh. M41. The story also quoted a number of citizens who expressed their anger at the officers accused of the beating death.

In addition to the anger expressed by Detroit residents, many police officers expressed bitterness over the Police Chief's quick reaction. Another headline in the November 9, 1992 Detroit Free Press read "Many officers are bitter about Knox's quick reaction." Many officers believed the whole story around the Green incident was not being told. Moreover, some officers believed the rush by Chief Knox and Mayor Young to suspend and publicly condemn the officers twenty-four hours after Green's death was tantamount to a trial and a finding of guilt.

> 'They made it sound like these guys were tried, found guilty, and on their way to Jackson Prison,' said [a Detroit Officer]. 'The chief should stand by his men until their found guilty or acquitted.'

> 'These officers should have been treated like everyone else. I don't believe it's going to be easy for them to get a fair trial,' said an undercover black officer who did not want to be identified.

Exh. M44.

On November 9 edition of the Detroit Free Press also included an editorial entitled "Police Beating: City must address problems of entire department." The editorial reads:

> Once something as tragic and wrong as the beating death of Malice Green at the hands of Detroit police has occurred, all the mayor and police chief can do is to try to atone for the wrong, control the damage, and seek punishment for the guilty. That they have moved quickly to do those things helps limit the tragedy that occurred late last week.

> But as grateful as we are and should be that Detroit has responded directly and firmly to this outrage, that isn't enough. Clearly, the department has unresolved problems of discipline and control. The evidence that at least some of the seven police officers now suspended were way out of line and used plainly unjustified force is simply overwhelming.

> The Police Department, the prosecutor and the courts will have to establish which officers were violent and to what degree. But the bare facts of the arrest, the beating and the death are too nearly incontestable to think this was anything but unnecessary force and an unnecessary death.

Exh. M48.

The headline on the front page of the November 9 Detroit News read "4 cops beat Green, medics say." The article was an account of the incident from the EMS workers who witnessed the incident. The News stated that the blows were struck at a downward angle, and there was no sign of defensive wounds. Budzyn told investigators that he suffered bruises while struggling with Green; the article reported that those wounds appeared to be self-inflicted. The article also reported that each of the seven officers involved were suspended from the department without pay pending investigation. "Each officer 'in one way or another took part in his death'—even those who never touched Green, police said."

An article in the November 9 Detroit News was headlined " 'Wake up, take city back,' NAACP leader tells rally." The article told of a group of demonstrators who gathered in downtown Detroit to protest the violence in Detroit and other U.S. cities. At the demonstration, Mahaffey promised to seek a council resolution asking the Detroit Police Commission to review personnel procedures regarding use of force. She also said the commission should increase in-service training to better control police behavior.

An article in the November 10 Detroit News was headlined "Who's policing the police?". According to the report, city and police officials reported that the Detroit Police Department was not doing enough to weed out "time bomb" police officers. Exh. M53. The article quotes Tom Schneider, president of the Detroit Police Officers Association who stated: "There are time bombs out there ... we all know that. But the department ignores it." Exh. M53. Another ranking police official familiar with the discipline procedures stated: "We are operating in the Dark Ages." The article was extremely critical of the way in which the Detroit Police Department handled police officers

who have a history of violent behavior and brutality complaints.

The Detroit News also included an editorial that was headlined "Police Under Fire." The article complained that because of lax administrative controls, the Detroit Police Department needed "a thorough shake-up." Exh. M59. The call for reform stemmed mainly from reports that Officers Budzyn and Nevers had been involved in past violent exchanges with Detroit residents.

The reputations of Officers Nevers and Budzyn were reportedly not lost on their superiors. A red flag should have been raised after 30 citizens filed complaints against Mr. Nevers, including four this year. The civilian Board of Police Commissioners found that just five were 'proper conduct.' Another 21 were dismissed for insufficient evidence which generally means it was the officers word against the complainant.... Both officers had a history of incidents in which citizens were injured. Yet while the evidence indicates that these were 'problem officers,' subject to more allegations of questionable misconduct than most others, they were never disciplined in relation to any alleged offenses and the command structure never tried to break up what may turn out to have been a deadly combination.

Exh. M59.

The November 10 Detroit Free Press included a cartoon by Bill Day which pictured a flashlight and defined it as "a large battery-operated portable electric light used by police to knock on African–American heads." Exh. 55.

Also in the November 10 Detroit Free Press was an article entitled "Lawyer surprised officer is on force." The article stated that Jeffrey Mallon, an attorney who collected a $275,000 settlement from the city after the fatal shooting of Jewell Denise Gant Davis in 1973, assumed that Nevers had been fired by the Detroit Police Department. According to the story, Davis was shot by officers assigned to STRESS during what police described as an attempted armed robbery of a fried chicken restaurant on Wyoming Avenue. Police claimed that they shot her only after she turned toward them and brandished a handgun. However, according to Mallon, court evidence showed that Davis

had been shot in the back and the handgun contained smudges of fingerprints, indicating it had been planted at the scene by police. Petitioner was reportedly involved in the shooting but was never charged. Exh. M56. The article also described another case in which Nevers allegedly attacked Robert Clark while Clark was waiting in a car for companions who were trying to steal a car near Tiger Stadium in July 1990. The city agreed to settle the lawsuit for an undisclosed amount. Exh. M56.

Another article in the November 10 Detroit Free Press was headlined "Detroit police feel hesitant in spotlight." The article described the anti-police sentiment brewing in the community at that time. The article quoted one Detroit Police Officer who stated: "In the last three days, its like you're a terrorist in the city, an occupying army."

The November 10 Free Press also included an article headlined "Cops version said Green struggled." The article told the officers version for the first time that Green was thrashing and kicking as they tried to subdue him. This version directly contradicted the accounts previously reported of the EMS workers and other witnesses who claimed that Green offered little or no resistance. The article was also the first to report Mayor Young's controversial and highly publicized statements he made on national television: "A young man who was under arrest was literally murdered by police." Exh. M61.

The November 12 Detroit News included a cartoon by Larry Wright in which pictured Mayor Young building a hangman's noose on a platform. The cartoon depicted Mayor Young standing on the platform and telling a mob of reporters: "Get away. I won't allow you folks to try this case in the media!"

The headline in the November 13 Detroit Free Press read "Racism killed ... Green." The article described Green's funeral which was attended by 2,000 people.

'The blood of Malice Green also says that the root of the problem that killed him is the uncured sickness of racism that plagues this society,' [Rev. Charles] Adams told 2,000 people who crowded Hartford Memorial Baptist Church.

'Racism killed Malice Green,' Adams thundered as the congregation at Hartford Memorial Baptist Church voiced agreement.

. . . . .

The congregation clapped, raised fists, or urged Adams to 'Preach, Charles!'

Exh. M84

The November 16 Detroit Free Press included an article entitled "NAACP has praise for mayor, chief" in which a national NAACP leader told a public forum that without the quick response by Mayor Young and Chief Knox, Detroit "would still have been burning at its walls today." The article also described a protest of approximately 125 people. The protesters chanted, "No faith in Knox, kill the killer cops," as they marched from the cite of Green's death on West Warren and 23rd Street to the 3rd (Vernor) precinct. Exh. M112.

The November 17 Detroit Free Press included the headline "The Death of Malice Green—Severity of charges divides community." The article described the differing opinions between police officers and community residents. While some police officers believed the charge of second-degree murder was excessive, many other officers believed that the charges were justified. Some officers, commenting to the press anonymously, were outspoken in their belief of the defendants' guilt. " 'They were wrong. Goddamn, it was excessive,' said [one] officer. 'I'd say these guys have to be prosecuted for the people to feel compensated.' " The article also quoted a number of Detroit residents who felt the officers should have been charged with first-degree murder. " 'Let's be for real,' said [one Detroit resident]. 'If it was anybody else, it would have been first-degree murder.' " Exh. M118. Another Detroit resident told the press: "It was cold-blooded murder to me." Exh. M118. Another resident was also outspoken about the charges. "I think Nevers is getting what he deserves. He's gotten away with so much stuff in this neighborhood for so long." Exh. M118.

The headline in the November 17 Detroit Free Press read "Charges answer call to justice." The article described four of the officers' arraignments. The quickness with which the indictments were handed down apparently pleased community leaders. "The speed with which the charges came pleased community leaders, and blunted a mounting anxiety that while Green lay buried, his accused attackers had not been held accountable. The investigation moved much more quickly than other cases involving police slayings." Exh. M122. However, the article also included statements from the officers attorneys who believed the officers had already been tried in the media and fair trials would be impossible in Detroit. Exh. M122.

The November 18 Detroit Free Press included an article entitled "Drugs in Green's body—Cops' lawyer says finding puts victim in new light." The article described a toxicology report from Green's autopsy which revealed that cocaine and alcohol were found in Green's system. Defense attorneys claimed that the reports may explain why the routine traffic stop turned deadly. However, prosecutors and community leaders were not persuaded that the results dictated a different result. The Rev. Wendell Anthony stated: "The fact that he has cocaine in his system does not excuse, does not condone, does not obstruct or legitimize misconduct on the part of the police department . . . For us to use this in any way to legitimize the death of this individual is irresponsible." Exh. M151. Moreover, Richard Lobenthal, the Michigan Director of the Anti–Defamation League of B'nai B'rith said: "In order to justify his being beaten, it presumes that seven police officers were incapable of subduing an unarmed man, and that's simply incredible." Exh. M151.

On November 18, the Detroit Free Press printed an article that directly contradicted the defendant's claim that drugs may have contributed to Green's death. In an article headlined "Green died from blows", according to the autopsy report, drugs were not likely a factor in Green's death.

The November 20 Detroit News included an editorial written by Pete Waldmeir (hereinafter "Waldmeir") headlined "One thing is clear in the Green case: Defendants' rights have been abused." Waldmeir claimed that because of prejudicial statements by city

leaders, fair trials in Detroit would be impossible.

No prosecutor and particularly no judge who has to stand for election in these parts is going to entertain any suggestion that the defendants' rights, such as they may be, have been collectively abused by city officials—at least two of whom already have passed judgment on the accused in the media.

Detroit Mayor Coleman Young, you'll recall, bluntly labeled the act 'murder' in a national television interview. Police Chief Stanley Knox made similar accusatory remarks short of that earlier on.

Exh. M166.

On December 15, the front page of the Detroit Free Press included an article headlined "Attorneys grill witnesses at hearing in Green beating." The article described the preliminary examination hearing held on Monday, December 14. Although the defense attorneys were pleased with the outcome, Green's family reacted differently. " 'They're full of it.' said [Green's brother-in-law]. 'They did what they did and it's murder, everybody knows that.' " Exh. M192.

The December 21 Detroit Free Press included an article headlined "Beating hearing hones in on details." The article indicated that both the officers' and Green's family attended the preliminary examination. The article also describes the intense media presence in the courtroom during the hearing. TV cameras and oversized still cameras occupied the jury box along side "scribbling reporters." Exh. M198.

The headline in the December 23 Detroit News read "City to settle Green case." The December 23 Detroit Free Press also included a similar article detailing the Green settlement with the city. The Detroit News article described the tentative agreement reached by the city of Detroit and Green's estate for $5.25 million.[5] The estate filed a civil suit for $61 million on November 9. The article also indicated the quickness of the settlement in the Green case was rather unusual. " 'The city rarely settles without lengthy, protracted litigation and negotiations,' [a Mt. Clemens lawyer] said. 'The firings (of the four officers charged with

criminal offenses) also seemed premature, since they haven't been tried.' " The article also recounted the daily events at Petitioner's preliminary examination. Exh. M208.

The January 26 Detroit Free Press included an article with the headline "Detroit police begin riot control training." The article indicated that police department officials feared "that acquittals or convictions on lesser charges for three white officers charged in the [Green] killing could ignite civil disturbances like those in Los Angeles [in 1991]." Exh. M237. According to the article, Chief Knox created a committee to determine whether the police department had enough riot equipment and was able to handle civil unrest that may occur. However, in an article printed the next day, Mayor Young and Chief Knox denied that the city was involved in riot control training. Exh. M238.

The February 1 Detroit News contained an editorial by Pete Waldmeir entitled "Getting a fair trial in Detroit may be next to impossible for accused officers." In Waldmeir's opinion, the officers' trial should be moved out of Detroit to a neutral site. He referred to the handling of the case by the city a "textbook screwup by the guys who fancy themselves in the white hats." Exh. M239. In support of his position he cited the following events: Mayor Young's comment referring to Green's death as 'murder'; Knox's suspensions of the police officers involved without investigation; the city's quick settlement with the Green family for $5 million, and the leak that the city police department is training for a riot if the officers are acquitted. According to Waldmeir, even if the Young administration did not intend to convey a message through the events listed above, the message actually conveyed was loud and clear.

A front page article in the February 15 Detroit Free Press was headlined "King jury members warn new panel." The article quoted former jury members in the Rodney King trial in Ventura County, California. The jury acquitted the officers accused of beating Rodney King which sparked riots that killed more than 50 people and caused more than $1 billion in property damage in

---

5. The Free Press article indicated that the settlement was for $5.1 million. Exh. M209.

1991. The jury members stated that after the verdict they received death threats which forced them to take their telephone numbers out of listing, change their license plate numbers, and even forced a few of them to obtain a gun permit. One of the jury members expressed doubt that a fair trial could be had in the second King trial given the price the first jury paid. "I find it real difficult to see how a jury can deliberate knowing what has gone on." Exh. M241.

The February 12 edition of the Detroit Free Press included an article headlined "Young says cop remarks 'opinion.'" The article described an interview Mayor Young gave to the Michigan Chronicle, a local Detroit newspaper, in which he responded to a question about police brutality in Detroit:

> In spite of the fact that there have been all kinds of changes taking place, there still is a strong streak of brutality in the police department—with black officers as well as white police officers.
>
> Now it's more often practiced by white officers. You've still got a lot of SOBs who are carryovers. Still got some guys who used to be on STRESS in the police department. In fact, one of these guys accused of killing Malice Green used to be on STRESS. So these guys are still around.

Exhs. M246, M254.

The headline in the Sunday, April 18 combined edition of The Detroit News and Free Press read "L.A. heaves big sigh of relief." The article describes the mood in Los Angeles after two officers involved in the Rodney King incident were found guilty of violating King's civil rights. The message was clear. Had the jury acquitted the officers again, Los Angeles would have erupted in a second wave of riots. However, the guilty verdict calmed the tensions and brought relief to many community residents who feared another riot. Exhs. M266–M268. The press often compared the Rodney King case to the Green case. Exhs. M260–M261.

An editorial in the Sunday, April 25 Detroit Free Press by Susan Watson was headlined "Outrage of Green settlement isn't $1 million for lawyers." Recent articles in both

the News and Free Press described Federal Judge Gerald Rosen's quarrel with the attorney regarding their fees in the Green settlement. Exh. M258. However, Watson stated that the problem with the settlement was not the attorney fees but the size of the settlement. She claimed it was "too small. Way to small. It's cheap and paltry." Instead she felt the Green family should have received more than $5.25 million to adequately reflect "community outrage and the enormity of the tragedy." Exh. M273.

### 2. PREJUDICIAL PRETRIAL PUBLICITY

██ Although many of the articles written about the Green incident were factual, a significant portion of the pre-trial publicity contained prejudicial information that so saturated the Detroit community, it became impossible for the defendants to receive a fair trial within the city. Moreover, unlike *Murphy v. Florida*, there was no significant time gap between the pretrial publicity and the beginning of trial. 421 U.S. at 802. The pretrial publicity continued almost unabated from the first article on November 7, 1992 to the beginning of voir dire on June 2, 1993. After a thorough review of the record, this Court finds that the manifest picture that appears is a community that was deeply prejudiced as to petitioners guilt. Under such circumstances this Court has grave doubt that petitioner received an impartial assessment of his guilt or innocence. Discussed below are the most serious and prejudicial examples of pretrial publicity surrounding the case.

First, both Mayor Young and Chief Knox made prejudicial statements to the media. Shortly after the Green incident, Mayor Young proclaimed in front of a nationally televised audience on NBC Nightly News: "A young man who was under arrest was literally murdered by police." Exh. M61. This statement is particularly prejudicial in that Mayor Young was revered in the city of Detroit as a hero.[6] Even after he declared that the defendants were guilty of murder on

---

6. *See* Melinda Wilson and Santiago Esparza, *Thousands Treasure Moment With Hero*, The Detroit News, December 4, 1997, at A1.

national television, he continued to be outspoken about the case. In an interview with the Michigan Chronicle, he proclaimed his feelings about police brutality in Detroit. Mayor Young stated that police brutality was practiced more often by white police officers than black police officers. He blamed the brutality on those officers who were once members of STRESS, including one of the officers involved in the Green incident. · Exh. M148. Not only was the jury aware that Petitioner was a member of STRESS, the information was often discussed and "set the tone from the beginning of [jury] deliberations." Juror affidavit C.

In addition to Mayor Young, Chief Knox also made a number of highly prejudicial statements to the press in an effort "to prevent the violence that rocked Los Angeles after officers charged with beating [Rodney] King were acquitted." Exh. M24. During a press conference held the day after the incident, Knox announced "[t]his type of thing will not be tolerated." Exh. M24. However, the most prejudicial statement by Chief Knox was most likely not intended as a statement at all. Within hours of the incident, Knox suspended all seven officers at the scene without pay and before any investigation. Exh. M34. Chief Knox's action, although intended to prevent civil unrest, clearly conveyed the message that the city in general, and the police department in particular, believed the seven officers were guilty. Although Chief Knox's intentions may have been virtuous, the result was plain; within hours of the incident, the seven officers were indicted, tried, found guilty, and suspended in the name of riot prevention. However, the Constitution of the United States does not bend to placate an enraged citizenry.

Second, approximately one month after the incident, the city agreed to settle a lawsuit filed by Green's estate for $5.25 million. Both the amount of the settlement and the quickness with which it was reached was shocking. " 'The city rarely settles without lengthy, protracted litigation and negotiations,' [a Mt. Clemens lawyer] said." Exh. M208. As if the petitioner's immediate suspension did not clearly communicate city official's belief that Nevers was guilty before he was even charged, the substantial and swift settlement removed any doubt.

Third, shortly before the trial, media reports surfaced that described preparations taken by the Detroit Police Department to defend against potential rioting in the event that the defendants were acquitted. Exh. M237. The Green case was repeatedly compared to the King case in Los Angeles. Exhs. M27, M260. The acquittal of the police officers in the first King trial ignited a riot in Los Angeles which left over 50 people dead and caused over $1 billion in damages. Exh. M260. Speculation rose· in Detroit whether the residents would react similarly in the event of an acquittal in the Green case. Exh. M237. After the second trial ended in two convictions of the Los Angeles police officers, the media reported that the convictions saved the city from further riots. Exhs. M266–268. The message in these comparisons is abundantly clear; jurors could avoid intense public scrutiny from community members and ·a riot in Detroit by convicting the defendants.

Finally, many of the widely publicized facts were not admissible at petitioner's trial. Immediately after the incident, reports began to circulate that petitioner was a former member· of STRESS (Stop the Robberies Enjoy Safe Streets), the controversial· police squad allegedly responsible for the deaths of twenty Detroit residents, seventeen of whom were young black men. Petitioners involvement in STRESS was recounted in the media on numerous occasions. Exhs. M25, M27, M32. Further, reports also surfaced that Nevers and Budzyn were known on the in the southwestern Detroit neighborhood where Green died as "Starsky and Hutch," a comment on their reputation as "tough-and-tumble" police officers. Exh. M23, M32. In addition, Mayor Young validated the reports when he publicly referred to Nevers and Budzyn as Starsky and Hutch. Exh. M23.

The Green incident ignited a firestorm of protest against what the community perceived as lax administrative control over "rogue cops" who had a reputation for violent behavior. Exhs. M41, M48, M53, M59, M60. Given the barrage of media accounts describing Nevers reputation in the community and his participation in STRESS, this Court has grave concerns that petitioner was convicted

not because of his involvement in the Green incident, but instead because of his reputation in the community and community discontent with the lack of administrative control in the police department.

■ The respondent argues that because each member of the jury swore to uphold his or her oath to only consider the evidence introduced at trial, this Court should not second guess the trial court's decision denying a transfer of venue. However, adverse pretrial publicity can create such a presumption of prejudice that the jurors claims that they can be impartial should not be believed. *Murphy v. Florida*, 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975); *Patton v. Yount*, 467 U.S. 1025, 1031, 104 S.Ct. 2885, 2888, 81 L.Ed.2d 847 (1984); *see also Sheppard v. Maxwell*, 384 U.S. 333, 351, 86 S.Ct. 1507, 1516, 16 L.Ed.2d 600 (1966). The torrent of prejudicial pretrial publicity surrounding the Green incident commands such a holding. The community was so permeated with hostility toward petitioner that his trial was nothing more than a "hollow formality." *Rideau*, 373 U.S. at 729, 83 S.Ct. at 1420.

The state also argues that because there was overwhelming evidence of petitioner's guilt any constitutional error was harmless error. However, as will be discussed in detail in the following section, this Court strongly disagrees with the Michigan Supreme Court that the evidence of petitioner's guilt was overwhelming. Moreover, even if the evidence of guilt were overwhelming, this Court does not believe that the harmless error analysis applies to petitioner's change of venue claim. In *Rideau*, the evidence of defendant's guilt was overwhelming; the Supreme Court nonetheless presumed prejudice. For this Court to hold otherwise, would mean that the Sixth Amendment protections do not extend to an obviously guilty defendant. In *Irvin v. Dowd*, the Supreme Court noted that a "fair trial in a fair tribunal is a basic requirement of due process" and stated that "[t]his is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies." 366 U.S. at 722, 81 S.Ct. at 1642; *see also Coleman v. Kemp*, 778 F.2d 1487, 1541 (11th Cir.1985).

■ Accordingly, for the reasons stated above, this Court finds that the trial court's refusal to change venue in the face of the immense prejudicial pretrial publicity was "manifest error." *Irvin v. Dowd*, 366 U.S. at 723, 81 S.Ct. at 1643. Moreover, this Court finds that the refusal to change venue upon petitioner's request was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d). Both the Michigan Court of Appeals and Supreme Court failed to address the presumed prejudice standard of *Rideau* and *Murphy*, but instead relied upon juror statements that they will be impartial. However, the adverse publicity so prejudiced Petitioner that the juror claims should not be believed. Moreover, as this Court will discuss in detail in the following section, while the jurors claimed to be impartial in front of the judge, behind closed doors a significant amount of inadmissible extrinsic evidence invaded their deliberations and thoroughly tainted Petitioner's trial. Therefore, petitioner's request for a writ of habeas corpus is granted.

## B. EXTRANEOUS INFLUENCES

■ Petitioner also alleges that he was deprived of his Sixth Amendment and Due Process rights where extraneous prejudicial influences reached the jury. The Court agrees.

■ The Sixth Amendment provides that a defendant tried by a jury of his peers has an absolute right to a fair and impartial jury. U.S. CONST. AMEND. VI; *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). Due process requires a "jury capable and willing to decide the case solely on the evidence before it...." *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982). Accordingly, a defendant's rights are violated when a jury's verdict is affected by prejudicial extraneous facts and information not introduced in evidence. *Mattox v. United States*, 146 U.S. 140, 13 S.Ct. 50, 36 L.Ed. 917 (1892); *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954); *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78

(1982); *Sheppard v. Maxwell,* 384 U.S. 333, 351, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966).

In examining the Petitioner's claims of extraneous influence on·appeal, the Michigan Supreme Court[7] focused on three items culled from the post-trial affidavits[8] of several jurors: (1) the jury's exposure to the film Malcolm X, (2) the jury's exposure to information that the City of Detroit was bracing for a riot, specifically, mobilization of the National Guard and the closing of freeways, in the event of an acquittal, and (3) the jurors consideration of extrinsic evidence regarding Petitioner's prior participation in the police unit STRESS, even though there was no evidence concerning this produced at trial. *People v. Budzyn,* 456 Mich. 77, 90, 566 N.W.2d 229, 235 (1997). The Court will briefly detail each of the items.

On August 2, 1993, prior to the close of evidence, the trial court advised the jury that although no testimony would be heard on August 5th and 6th, they would be required to come to court on both days. *Id.* at 91, n. 13, 566 N.W.2d 229. Apparently, at the request of the jurors, the Court agreed to allow them to watch videotaped movies. The jurors were instructed by the Court that they would not be able to bring their own movies, rather, the movies would be supplied by the Court. Juror affidavits C, D. The Petitioner's jury was given the film Malcolm X, among others. The jury watched approximately half of the film. Juror affidavit C.

The opening sequence of the film—based on Malcolm X's autobiography—begins with the voice of Malcolm X's character giving a speech charging the white man with being the greatest murderer on earth. *People v. Budzyn,* 456 Mich. 77, 93–96, 566 N.W.2d 229, 236–38 (1997). The voice over also specifically mentions the City of Detroit. According to the Michigan Supreme Court the narrative is as follows:

> Brothers and sisters, I am here to tell you that I charge the white man, I charge the white man with being the greatest murderer on earth.· I charge the white man with

being the greatest kidnapper on ·earth. There is no place in this world that man can go and say he created peace and harmony. Everywhere he's gone he's created havoc. Everywhere he's gone he's created destruction. So I charge him, I charge him with being the greatest kidnapper on this earth. I charge him with being the greatest murderer on this earth. I charge him with being the greatest robber and enslaver on this earth. I charge the white man with being the greatest swine eater on this earth, the greatest drunkard on this earth. He can't deny the charges. ·You can't deny the charges. We're the living proof of those charges. You and I are the proof. You're not an American. You are a victim of America. You didn't have a choice coming over here. He didn't say "black man, black woman, come on over and help me build America." He said "nigger get down in the bottom of that boat and I'm taking you over there to help me build America." Being born here does not make you an American. I'm not an American. You're not an American. You're one of the twenty-two million black people who are victims of America.

*Id.* at 94, n. 15, 566 N.W.2d 229.

Even more significant than the provocative language cited above is that during this voice over narration, footage of Rodney King being beaten by Los Angeles police officers is interspersed with a picture of an American flag. *Id.* at 93–94, 566 N.W.2d 229. The footage of Rodney King being beaten is shown in slow motion—and repeated eight times—as the American flag begins to burn. *Id.* In addition, the narration makes explicit reference to the City of Detroit:

> [W]e didn't see any democracy on the streets of Harlem, ... on the streets of Detroit.·... No, we've never seen democracy. All we've seen is hypocrisy. We

---

**7.** Following his conviction Petitioner did bring a motion for a new trial based on the extraneous influences that reached the jury. The trial court denied the motion finding that there was no error. The Michigan Court of Appeals affirmed, also finding no error. The Michigan Supreme Court found that certain of the extraneous influences were constitutional error, but found that error harmless as to the Petitioner.

**8.** *People v. Budzyn,* 456 Mich. 77, 92 n. 14, 566 N.W.2d 229, 236 (1997).·

don't see any American dream. We've experienced only the American nightmare. *Id.* at 94, n. 15, 566 N.W.2d 229.

Later, in another scene in the film, the Malcolm X character makes obvious reference to white police officers when he states:

No, I'm telling you that devil has made dead souls out of you and I.... Why, my brothers and sisters, he should get down on his knees. · He should beg our mercy. Oh, my brothers and sisters, his kind has committed God's greatest crime against your and my kind every day of his life. He ought to get on his knees and say he's committed the crime. But does he do that? Does he do that? No. No, he scorns you. *He splits your head with his night stick, he busts you upside the head with that billy club, he calls you a nigger.* I'm telling you he calls you a coon. That's what he says to you—"Boy," "Nigger." Four hundred years is long enough. You've been sitting down, laying down, and bowing down for four hundred years. I think it's time to stand up.

*Id.* at 94–95, 566 N.W.2d 229 (emphasis added).

The Michigan Supreme Court found that viewing the movie with its forceful words and images could have triggered an inappropriate emotional response in the jury because the defendants' conduct, as alleged, matched that described by the Malcolm X character, as well as the images shown in the opening sequence of the film. *Id.* at 96, 566 N.W.2d 229. The court found that it may have been difficult for the jury to set aside those words and images and examine, bias fee, the testimony of the defendants as well as that of other prosecution witnesses. *Id.* at 96–97, 566 N.W.2d 229. As the state court said:

In focusing the jurors attention in a very emotional way on the racial element of the crime, the images from the film invited the juries to view the instant crime as part of a pattern of police brutality, effectively ask-

ing them to redress this injustice. The juries were, however, bound to decide the case on only the facts as presented at trial and to weigh defendants' credibility without consideration of these extraneous factors.

*Id.* at 97, 566 N.W.2d 229.

In addition to being shown the Malcolm X film, at least one member of petitioner's jury learned during deliberations that the City of Detroit was bracing for a riot in the event of an acquittal. *Id.* at 98, 566 N.W.2d 229. According to the juror affidavits the juror was aware of fact that "in the event of a riot, they were going to close the freeways.... [and] the National Guard was being put on alert for our verdict." *Id.* at 98, n. 21, 566 N.W.2d 229. The Michigan Supreme Court thus held that although the jurors obviously should not have considered whether there would be a riot if they acquitted the defendants, "the reality is, however, that the jurors' knowledge that the city was preparing for a possible riot may have caused them to fear an acquittal." *Id.* at 98, 566 N.W.2d 229.

Furthermore, the jurors were exposed to, and considered, information that petitioner had previously been a member of the highly controversial police unit STRESS.[9] Although this information was not introduced at trial, the jurors considered it during their deliberations, and apparently considered it significant: "During deliberations, Mr. Nevers' participation in STRESS was discussed, and it kind of set the tone from the beginning of our deliberations. It was explained during deliberations that STRESS was a police group that regularly abused young black males in the city." Juror affidavit C.

The Michigan Supreme Court found the fact the jury considered such information highly prejudicial. The court correctly stated that:

This is the kind of concrete, factual evidence that could substantially compromise

9. The acronym STRESS stood for: Stop The Robberies Enjoy Safe Streets. The unit was a controversial decoy unit of the Detroit Police Department that gained a reputation for brutality after 20 people, most of them black, died at the hands of police officers over a three year period. *People v. Budzyn*, 456 Mich. 77, 90–91, 566 N.W.2d 229, 236 (1997); *See also* Petitioner's

Appendix, V. II, pg 394a. As a juror from Petitioner's jury stated "[i]t was explained during deliberations that STRESS was a police group that regularly abused young black males in the city." Juror affidavit C. The group was disbanded by then Mayor Coleman Young in 1974. Petitioner's Appendix, V. II, pg. 394a.

the ability of a jury to issue a fair verdict because the evidence relates directly to the past conduct of the police officers. This extraneous influence creates more than an emotional reason to convict. It suggests ... that these officers may have been acting in accordance with their preexisting racist predisposition to target young black men for abuse when they encountered Malice Green.... It is the kind of evidence that has a direct and rational connection between it and an adverse verdict.... Similarly, in hearing that defendant were members of an allegedly violent and racist unit, the juries' ability to resolve factual questions before them may have been severely impaired.

*Id.* at 99–100, 566 N.W.2d 229.

The Michigan Supreme Court found that these external influences created a real and substantial possibility that the jury's verdict was affected. *Id.* at 100, 566 N.W.2d 229. It is undisputed that these extraneous influences reached the jury. Moreover, it is undisputed by either the Petitioner or Respondent that the Michigan Supreme Court was correct in its determination that the above cited influences constituted a constitutional error of Petitioner's Sixth Amendment and Due process rights. Accordingly, the Court need not address the issue other than to state that the Court finds the state court determination of constitutional error neither contrary to, nor an unreasonable applicable of, federal law. 28 U.S.C. § 2254(d)(1). Therefore, the question turns to the error's harmlessness, or lack thereof.

■■■ In addition to a finding that a constitutional error occurred during the Petitioner's trial, before a Court may grant habeas relief it must also find that the error was not harmless. *Chapman v. State of California,* 386 U.S. 18, 22–25, 87 S.Ct. 824, 827–828, 17 L.Ed.2d 705 (1967) (constitutional error does not automatically require reversal). Constitutional errors are generally categorized as one of two types: structural error and trial error. *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). This is significant because if an error is of the structural type, harmless error analysis does not apply. However, if the error is considered trial error, the Court must determine if the error was harmless. *Id.; Arizona v. Fulminante,* 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

■■■ Structural errors are those that affect the entire conduct of the trial from beginning to end and defies harmless error analysis. *Arizona v. Fulminante,* 499 U.S. 279, 309–310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). A structural error is one which affects "the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* The Supreme Court has found structural errors in very few contexts. *See Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (total deprivation of the right to counsel); *Tumey v. Ohio,* 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (lack of impartial trial judge); *Vasquez v. Hillery,* 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (unlawful exclusion of grand jurors of defendant's race); *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (the right to self-representation at trial); *Waller v. Georgia,* 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (right to public trial); *Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (erroneous reasonable doubt instruction to jury).

■■■ Trial error on the other hand occurs during the presentation of the case to the jury and is amenable to harmless error analysis because "it may ... be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless...." *Arizona v. Fulminante,* 499 U.S. 279, 307–308, 111 S.Ct. 1246, 1263–1264, 113 L.Ed.2d 302 (1991). In contrast to the relatively few structural errors the Court has identified, the Supreme Court has found harmless error analysis applicable to a wide range of constitutional errors. *Id.* at 306–308. (listing cases applying harmless error to various errors).

Petitioner contends that the error in this case—the jurors exposure to, and consideration of, extrinsic evidence—is of the structural type, thus requiring automatic reversal without regard to its harmlessness.[10] *Brecht*

---

10. The Michigan Supreme Court implicitly found the error to be of the trial type as it proceeded to apply harmless error analysis. *People v. Nevers,* 456 Mich. 77, 101, 566 N.W.2d 229, 240 (1997).

*v. Abrahamson,* 507 U.S. 619, 629–31, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993). The Petitioner argues that the extraneous influences which reached the jury "infected the trial process at its most critical stages." That may well be true. However, the extraneous information came into the jury room after trial began, and near the close of evidence. The information and the resulting effect did not occur in the beginning of the trial such that it "affect[ed] the framework within which the trial proceed[ed]" *Arizona v. Fulminante,* 499 U.S. 279, 310, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). Although a structural error need not necessarily be one that occurs at the beginning of trial, all but one of the relatively few structural errors identified by the Supreme Court involve situations where the error was present at the beginning of the trial. *See Sullivan v. Louisiana,* 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (erroneous reasonable doubt instruction to jury constitutes structural defect). Thus, the error here is not analogous to those instances where the Supreme Court has previously held an error to be structural.

The error being considered in this portion of the Court's opinion is not one that indicates a lack of unbiased participants in this case from the start such that it was a structural error. Rather, it is more closely categorized as one "which occurred during the presentation of the case to the jury." *Arizona v. Fulminante,* 499 U.S. 279, 307–308, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). Moreover, the Supreme Court has held that extraneous influence claims fall within that category of error which may be considered trial error, and therefore subject to harmless error analysis. *See Smith v. Phillips,* 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982) ("due process does not require a new trial every time a juror has been placed in a potentially compromising situation."); *See also Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) (government had to show extraneous third party contact with juror harmless).

■ Accordingly, the Court finds that the extraneous information constituted a trial error, and is therefore subject to harmless error analysis. Having found that the error is subject to harmless error analysis, the question then presented is which harmless error standard applies.

The harmless error standard applied by federal courts on habeas review has undergone changes. Previously, the case of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), provided the harmless error standard to be used in evaluating constitutional error. *Chapman* held that constitutional violations required relief unless proven by the government to be harmless beyond a reasonable doubt. *Id.* at 24. The state has the burden of proving that the error is harmless. *Brecht v. Abrahamson,* 507 U.S. 619, 630, 113 S.Ct. 1710, 1717, 123 L.Ed.2d 353 (1993). Thus, state courts, and federal courts, used the *Chapman* harmless error standard in assessing the harmlessness of constitutional errors, whether on habeas review or on direct appeal. *Brecht v. Abrahamson,* 507 U.S. 619, 629, 113 S.Ct. 1710, 1718, 123 L.Ed.2d 353 (1993) (discussing previous application of *Chapman*).

In 1993 the Supreme Court held that no longer should the federal courts continue to apply the same standard on collateral review that the state courts applied on direct review, i.e.,—*Chapman's* harmless beyond a reasonable doubt standard. *Id.* at 637–39. Rather, the Supreme Court found that a different standard should apply on federal habeas review of state convictions and thus adopted the harmless error standard set forth in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). *Id.*

Specifically, the standard set forth in *Kotteakos* and adopted by *Brecht* is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993) *quoting Kotteakos v. United States,* 328 U.S. at 776, 66 S.Ct. at 1253 (1946). There is no burden on the petitioner to establish that the error was prejudicial. *O'Neal v. McAninch,* 513 U.S. 432, 436–40, 115 S.Ct. 992, 994–96, 130 L.Ed.2d 947 (1995). Rather, the inquiry on habeas is "Do I, the judge, think that the error substantially influenced the jury's decision?" *Id.* at 436. The focus is not "merely whether there was enough to support the result, apart from the phase affected by the

error. It is rather, even so, whether the error itself has substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand." *O'Neal v. McAninch,* 513 U.S. 432, 438, 115 S.Ct. 992, 995, 130 L.Ed.2d 947 (1995) *quoting Kotteakos v. United States,* 328 U.S. at 764–65, 66 S.Ct. at 1248 (1946); *See also California v. Roy,* 519 U.S. 2, ——, 117 S.Ct. 337, 338, 136 L.Ed.2d 266 (1996). Accordingly, if a federal judge on habeas review "is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless. And, the petitioner must win." *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995), *quoting Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993).[11]

Thus, as *Brecht* and *O'Neal* clearly set out, federal courts on habeas review are to determine whether trial errors had a substantial and injurious effect or influence on the verdict. *Id.* And, if so, the error was not harmless and the petitioner must win. *Id.* This is the standard that both Petitioner and Respondent argue that the Court should apply in reviewing whether the error was harmless. However, Congress' recent enactment of the AEDPA and the changes to § 2254(d)(1) has muddied the waters. It is no longer clear that the questions posed by *Brecht* and its progeny are those that a federal habeas court must now ask.

Under the AEDPA this Court's ultimate inquiry on habeas is: (a) whether the state court applied the correct law, in this case the correct harmless error standard on direct review—i.e., the *Chapman* standard; and (b) whether the state court's application of that standard was reasonable in light of the facts of the case. *See* 28 U.S.C. § 2254(d)(1). A question arises because § 2254(d)(1) instructs a federal court on habeas review to grant habeas relief only if the state court

decision was "an unreasonable application of ... Federal law". However, the federal law which a state court applies to constitutional error is the *Chapman* harmless beyond a reasonable doubt standard. This is in contrast to the more deferential *Brecht* standard applied by federal courts on habeas review, i.e., did the error have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). Thus, section 2254(d)(1), by constraining a federal court to review of whether the state decision was an "unreasonable applicable" seemingly renders *Brecht* and its standard moot. A strict reading of 2254(d)(1) would seem to indicate that the Court's inquiry in this case is focused on whether the state court's application of *Chapman* was unreasonable.

This interpretation of § 2254(d)(1) would vitiate the Supreme Court's decision in *Brecht* and federal courts would once again be applying the *Chapman* standard, at least in so far as to determine whether the state court's application of it was unreasonable. 28 U.S.C. § 2254(d)(1). It seems unlikely this was the intent of Congress when the Supreme Court had already held a more deferential standard of review applied on habeas proceedings. *Brecht v. Abrahamson,* 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993); *O'Neal v. McAninch,* 513 U.S. 432, 436, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995). Nonetheless, the clear language of the statute seems to require such result.[12] However, the Court is hesitant to disregard such clear Supreme Court precedent and discard completely the *Brecht* standard when neither the Petitioner nor the Respondent address the issue. Moreover, the Court is unable to locate any authority addressing this issue. With these things in mind and because the issue is one that is as of yet unresolved, in the interest of completeness the Court will address both approaches.

---

**11.** Because the Court finds, *infra,* that the error did have a substantial and injurious affect or influence on the verdict, it need not address Petitioner's claim that the footnote 9 exception from *Brecht* is applicable to the case at bar.

**12.** It could be argued the more deferential standard of review found in the amended

§ 2254(d)(1) was meant to codify the *Brecht* standard, thus, federal habeas courts still determine whether the error had a substantial and injurious affect or influence on the jury's verdict, and, if so, then the error was not harmless, and the state court's decision was an unreasonable application of *Chapman.* However, such a speculative approach is tenuous at best.

First, whether the state court's application of *Chapman*—that the constitutional error was harmless beyond a reasonable doubt—was an unreasonable application of law to the facts. Second, and alternatively, did the error have a substantial and injurious effect or influence in determining the jury's verdict. The problem however, at least in this case, is largely academic. Under either approach the Court reaches the same result, i.e., the Court answers both questions in the affirmative.

■ The Michigan Supreme Court, although not explicitly identifying the standard by name, clearly applied the proper *Chapman* harmless error standard on direct review. *People v. Budzyn*, 456 Mich. 77, 101, 566 N.W.2d 229, 240 (1997). Accordingly, the decision of the court was not contrary to federal law under § 2254(d)(1). However, the Court finds that the state court application of that standard to the facts of this case was clearly unreasonable.

Pursuant to *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), constitutional trial errors must be proven harmless beyond a reasonable doubt. The test is whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Id.* at 24. This standard is similar to a standard requiring reversal if " 'there is a reasonable possibility that the evidence complained of might have contributed to the conviction' " *Id.* (quoting *Fahy v. Connecticut* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)). "To say that an error did not contribute to the verdict is . . . to find that error unimportant in relation to everything else the jury considered. . . ." *Yates v. Evatt*, 500 U.S. 391, 403, 111 S.Ct. 1884, 1893, 114 L.Ed.2d 432 (1991). Stated another way, "[t]he inquiry . . . is not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but, whether the guilty verdict actually rendered in this trial was surely unattributable to the error." *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081–82, 124 L.Ed.2d 182 (1993).

The Michigan Supreme Court found that the constitutional error in Petitioner's case was harmless beyond a reasonable doubt because of "overwhelming evidence" of Petitioner's guilt. *People v. Budzyn*, 456 Mich. 77, 101, 566 N.W.2d 229, 240 (1997). In reviewing the record in this case, the Court has no doubt that the state court determination that the error was harmless was an unreasonable application of federal law.

In addressing the harmlessness of an error, it follows that the magnitude of the error, or errors, must be taken into account. *See generally Brecht v. Abrahamson*, 507 U.S. 619, 638–39, n. 9, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). It is undisputed that the extraneous influences in this case reached the jury. *People v. Budzyn*, 456 Mich. 77, 566 N.W.2d 229 (1997). It is also undisputed that the jurors considered, some, if not all, of the extraneous information during their deliberations. Juror affidavits C, D. It also cannot be seriously disputed that the constitutional error(s) in this case were substantial, egregious, repeated, and highly prejudicial.

The movie Malcolm X was particularly harmful because of the undeniable parallels between the images and words of that film and the conduct alleged against the defendant(s). The film showed—eight times and in slow motion—a black motorist, Rodney King, being beaten by white police officers. Petitioner's case involved white police officers using force against a black motorist, Malice Green. The viewing of the movie by the jury cannot be dismissed as mere entertainment. The implication of viewing the Rodney King footage can scarcely be denied: "This is what it looks like." A point confirmed by a juror (apparently a venireman) who watched the videotape and "actually thought that the Rodney King video was a video of the Malice Green incident." Juror affidavit D. Moreover, the jurors themselves recognized the parallels between the Rodney King case and Petitioner's and discussed it: "[t]he similarities between Rodney King and this case were discussed, and the fact that it was cops beating a black man." *Id.*

Moreover, the timing of the jury being shown the film and the fact that it was supplied by the Court added to the harmful effect. The movie was shown approximately seven days before the jury began deliberations, and just several days after the Petitioner has testified. Thus the images and

words from the film would be fresh in their minds as they began the deliberative process. In addition, the movie carried the imprimatur of the Court. Although the trial court apparently did not select the movie for the jury, the trial court did tell the jurors it would supply the movies they would watch. The fact that the Court failed to give a curative instruction after the movie was viewed left the impression on the jury that the movie was 'sanctioned' by the trial court judge.

The fact that jurors discovered and discussed information relating to Petitioner's previous membership in the controversial police unit STRESS was highly prejudicial from the standpoint that it would be certainly viewed as evidence of Petitioner's bad character. It suggested guilt by prior bad acts, namely, that because the Petitioner was a member of that organization, he 'had done this sort of thing before'. The jury's duty to "weigh the relative credibility of witnesses in a case that turned almost entirely on whose version of events the jury found more credible.... is severely impaired when it improperly receives information that besmirches the defendant's character." *United States v. Hall*, 85 F.3d 367, 371 (8th Cir.1996).

In addition, the Court cannot imagine a more prejudicial extraneous influence than that of a juror discovering that the City he or she resides in is bracing for a riot—including activating the National Guard and closing freeways—in the event the defendant on whose jury you sit is acquitted. The magnitude of such extraneous influence cannot be overlooked.

Accordingly, this was not simply a case of one or two minor instances of extraneous influence finding its way into the jury room,

but, rather, serious, repeated encroachments of the Petitioner's constitutional right to have a jury decide the case solely on evidence submitted at trial.[13] *Smith v. Phillips*, 455 U.S. 209, 217, 102 S.Ct. 940, 946, 71 L.Ed.2d 78 (1982); *Turner v. Louisiana*, 379 U.S. 466, 472–73, 85 S.Ct. 546, 549–50, 13 L.Ed.2d 424 (1965).

The jury's repeated exposure to these extraneous influences presented highly prejudicial and constitutionally impermissible grounds on which to disregard the testimony of the defendant and give undue weight to the evidence presented by the state. Clearly the evidence against the Petitioner would have to be truly overwhelming in order to render error of such magnitude harmless beyond a reasonable doubt. However, the state court did little more than to decree it so. *People v. Budzyn*, 456 Mich. 77, 101–103, 566 N.W.2d 229, 240–41 (1997). Needless to say, merely stating that the evidence against the Petitioner was overwhelming does not necessarily make it so.

In finding that the evidence against the Petitioner was overwhelming, and therefore harmless beyond a reasonable doubt, the Michigan Supreme Court relied on the testimony of four EMS workers. *Id.* The court found that the EMS witnesses, "who had no apparent motive to lie", provided "interlocking testimony" that the Petitioner beat Malice Green in the head while Green was not offering significant resistance. *Id.* at 101–103, 566 N.W.2d 229. Therefore, the court held that "the people have proven that there was unimpeachable, compelling evidence that defendant Nevers harbored, at the very least, an unjustified intent to commit great bodily harm against Green." *Id.*

**13.** Because the Court finds dispositive the error(s) relating to the Malcolm X movie, STRESS, and the information on rioting, the Court is not addressing the other errors alleged to have taken during the Petitioner's trial, such as: jurors' examination of a "trial manual" and a copy of "sentencing guidelines", jurors' knowledge and consideration of the contradictory testimony of Petitioner's co-defendant, or the jurors' knowledge that the Petitioner had moved for a mistrial on the basis of the movie Malcolm X being shown (Petitioner's brief pg. 17–21). Also, the Court will not address the extraordinary and absolutely baffling circumstance of the trial judge

having a witness read from a law dictionary, the Michigan Rules of Evidence, and the Bible (Petitioner's Appendix, V. I, 4a–10a).

This Court also will not address Petitioner's claim that Respondent failed to disclose impeachment evidence relating to the cause of death and monetary awards and other inducements paid to key prosecution witnesses. *Brady* requires that the prosecutor disclose all exculpatory and impeachment evidence. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *see also U.S. v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

The only factual support the court offers for the assertion that the evidence was overwhelming is found in footnote 26, which contains several very brief excerpts of the EMS worker's testimony. *Id.* at 102, 566 N.W.2d 229. Although the excerpts provide details of the injuries sustained by Green, they make no mention of the inconsistencies in the EMS worker's testimony, or the contrary version of events found in the testimony of the Petitioner.

The Michigan Supreme Court apparently found the testimony of the EMS workers to be 100% accurate and completely true and thus overwhelming evidence of Petitioner's guilt. *Id.* However, the only way the Michigan Supreme Court could so find is by ignoring the significant inconsistencies in EMS workers' testimony, and by completely disregarding the testimony of Petitioner.

Although all four of the EMS workers testified that the Petitioner struck Malice Green, that alone is not dispositive or overwhelming evidence of his guilt, for the simple reason that Petitioner admitted that he struck Green (Nevers, 8/3/93, 39–53). Moreover, the EMS workers' testimony regarding the events that took place varies substantially with each other, with that of the Petitioner, and with that of the civilian witnesses.

EMS worker Albino Martinez, who arrived on the scene first with Mithyim Lewis at approximately 10:20 p.m., testified to seeing Petitioner strike Green four times (Martinez 6/21/93, 101). He also testified that Green was kicking and struggling with the Petitioner and squirming/moving around before any blows by the Petitioner (6/21/93, 78) (6/22/93, 107). Martinez also testified that Petitioner hit Green in the side with his fist after Green was handcuffed, and that he placed his foot on Green's neck (6/21/93 98–100) Martinez testified that when Green was pulled from the car he landed on the pavement on his stomach (6/21/93, 96).

Mithyim Lewis also testified to seeing Petitioner strike Green four times. (Lewis, 6/23/93, 18, 29). He also testified that Green tried to get up after being pulled from the car and struggled as he was being handcuffed (6/23/93, 31, 33). Lewis testified that once Green was handcuffed no one else struck him, (6/23/93, 36), and that the Peti-

tioner was not one of the officers who frisked Green (6/23/93, 164–65). Lewis further testified that Petitioner did not strike Green once he was on the ground nor did he stand on his neck (6/23/93, 164–65).

EMS worker Scott Walsh, who arrived on the scene last with Lee Hardy at approximately 10:28 p.m., testified that he saw Petitioner strike Green in the head three times while Green was in the car and two blows to the side when Green was on the ground (Walsh, 7/14/93, 147; 7/15/93, 121). Furthermore, Walsh stated that Petitioner hit Green's hands four or five times once Green was on the ground (7/14/93, 157). Walsh also testified that Petitioner was trying to get Green under control before hitting him (7/15/93, 22).

EMS worker Lee Hardy, who arrived on the scene with Walsh, testified that Petitioner struck Green about ten times on the head and four to five times on the left hand (Hardy, 7/15/93, 198). Hardy also testified that he saw no resistance by Green, but later testified that Green sat up after he was handcuffed and while Petitioner was frisking him Green would push away his hands (7/15/93, 185–186, 217–218). Hardy also testified that while Green was being handcuffed the Petitioner stood on his hands and struck him in the side with his flashlight (7/15/93, 219). Hardy stated that Green was stuporous yet he was moving in the car (7/19/93, 14–16). Hardy also testified that when pulled from the car, Green landed on his back (7/16/93, 56). Hardy also testified that Green had two seizures at the scene, although Martinez testified he had only one (Hardy, 7/15/93, 230) (Martinez, 6/21/93, 105).

Petitioner took the stand at trial and gave testimony that differed substantially from that given by the EMS workers. Petitioner testified that Green was attempting to knee or kick him in the chest when he and his partner first tried to subdue Green on the passenger side of Green's automobile and get him to open his hand which apparently contained rock cocaine (Nevers, 8/3/93, 39). During this time, Petitioner stated that he struck Green on the knees with his flashlight to prevent him from kicking (8/3/93, 39). According to Petitioner's testimony, Green at-

tempted to get out of the car on the driver's side and Petitioner ran around to that side to stop him (8/3/93, 42). In further struggling with Green on that side of the car, Petitioner testified that Green reached for, and grabbed, the handle of his holstered weapon (8/3/93, 43). Petitioner then struck Green in the head with his flashlight to prevent him from obtaining his gun (8/3/93, 44). Petitioner testified that although he ordered Green to stop, the struggle continued and as he held on to Green's left hand, Green was pulling the Petitioner towards him and waving his right arm and fist around (8/3/93, 47). During the struggle, Petitioner glimpsed a shiny object between Green's fingers (8/3/93, 47). Fearing that the object was some type of weapon, Petitioner struck Green again on the head (8/3/93, 48). Thereafter, another officer arrived on the scene and pulled Green from the car to the pavement and handcuffed him (8/3/93, 49). Petitioner testified that he neither assisted with the handcuffing or frisking of Green, or struck him, once he had been pulled from the car (8/3/93, 50). Petitioner's testimony was that he struck Green a total of five or six times in the head during the struggle when he feared Green was reaching for his gun and or had a weapon in his hand, but did not strike Green at any time once he was pulled from the car and placed on the ground (8/3/93, 50–51, 80).

As can be seen from these brief examples, the testimony was not so uncontroverted or one-sided that there was 'overwhelming' evidence of Petitioner's guilt. The testimony of the EMS workers, in light of Petitioner's own testimony, is neither 'compelling', 'unimpeachable', or 'interlocking'. When the record is viewed as a whole, including the testimony of the Petitioner, there simply is not 'overwhelming evidence' that Petitioner harbored "an unjustified intent to commit great bodily harm against Green." *People v. Budzyn*, 456 Mich. 77, 101–103, 566 N.W.2d 229, 240–41 (1997). Although the EMS workers did testify to varying degrees about Green's actions, or lack thereof, and the blows inflicted by the Petitioner, the Petitioner testified that he struck Green five or six times, but only because he was struggling and posed a threat to his life and safety when he allegedly reached for his gun and appeared to have a weapon. Furthermore, the fact that Peti-

tioner testified that he only struck Green five or six times and medical testimony was heard which indicated that Green was struck 14 times does not support a finding of overwhelming evidence in light of the Petitioner's contrary testimony and the widely varying accounts presented by the EMS workers.

Accordingly, notwithstanding the state court's assertion to the contrary, this was simply not a case where the evidence of Petitioner's guilt was overwhelming. The facts by themselves do not affirmatively prove the Petitioner's guilt or innocence; as he admitted striking Green. The issue came down to whether the jury found credible Petitioner's version of events, including how many times he struck Green and the claims that Green was fighting, appeared to have a weapon, and reached for the Petitioner's gun, thereby placing the Petitioner in fear of his health and safety. Thus, rather than physical evidence, it was clearly Petitioner's credibility, or lack thereof, which resulted in his conviction. The state court recognized that the case was indeed one that involved a credibility contest. *People v. Budzyn*, 456 Mich. 77, 100, 566 N.W.2d 229, 239 (1997) ("[p]articularly in a case, like this one, that was a credibility contest"). However, the jury in this case was "never allowed to simply weigh the conflicting testimonies of the parties". *Gravley v. Mills*, 87 F.3d 779, 790 (6th Cir.1996). Instead, the jury was exposed over and over again to highly prejudicial extraneous influences which created a substantial likelihood the jury would disregard the testimony of the defendant and give undue credence to the witnesses presented by the state. Notwithstanding the state court claim that the evidence was overwhelming, the record does not even minimally support such a conclusion.

Under these circumstances it is impossible to say "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967); *See also Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081–82, 124 L.Ed.2d 182 (1993). In fact, the Court is convinced that the verdicts were *not* based solely on the evidence and testimony present-

ed at trial. The juror affidavits alone make this clear. Moreover, the Michigan Supreme Court erroneously focused on the sufficiency of the evidence submitted at the trial rather than on whether the extraneous influences contributed to the conviction of the Petitioner. *Sullivan v. Louisiana*, 508 U.S. 275, 279, 113 S.Ct. 2078, 2081–82, 124 L.Ed.2d 182 (1993) (the focus on harmless error is not whether without the error a guilty verdict would have been issued, but, rather, whether the guilty verdict actually rendered was unattributable to the error); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

Therefore, after reviewing the state court decision, the record, and the magnitude of the error presented in this case, and for the reasons stated above, the Court, applying 28 U.S.C. § 2254(d)(1), finds that the Michigan Supreme Court's determination that the evidence against the Petitioner was overwhelming and thus harmless beyond a reasonable doubt, was an unreasonable application of federal law as established by *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Because the AEDPA imposes a higher burden on habeas petitioners than the previous approach, it is clear that Petitioner would be entitled to relief under the *Brecht* standard of 'whether the error had a substantial and injurious effect or influence in determining the jury's verdict' as well. *Brecht v. Abrahamson*, 507 U.S. 619, 637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993). For the same reasons detailed above, the Court finds that the error(s) at Petitioner's trial did have a substantial and injurious effect on the jury's verdict, thus, the "error is not harmless. And, the petitioner must win." *O'Neal v. McAninch*, 513 U.S. 432, 436, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995).

## V. CONCLUSION

The Court is aware of the public interest in this case and does not lightly reach the decision it does today. However, to allow Petitioner's criminal conviction to stand, under the circumstances presented here, would run counter to the constitutional guarantees of the Sixth Amendment. As the Supreme Court has stated:

The requirement that a jury's verdict 'must be based upon the evidence developed at the trial' goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury.

\* \* \* \* \* \*

In the constitutional sense, trial by jury in a criminal case necessarily implies at the very least that the 'evidence developed' against a defendant shall come from the witness stand in a public courtroom where there is full judicial protection of a defendant's right of confrontation, of cross-examination, and of counsel.

*Turner v. Louisiana*, 379 U.S. 466, 472–473, 85 S.Ct. 546, 549–50, 13 L.Ed.2d 424 (1965).

The Court has broad discretion to dispose of a petition for a writ of habeas corpus as "law and justice require." *See* 28 U.S.C. § 2243. Therefore, for the reasons stated above, IT IS HEREBY ORDERED that Petitioner's state court judgment of conviction is VACATED. IT IS FURTHER ORDERED that his petition for a writ of habeas corpus is GRANTED and he is ORDERED released from custody forthwith.

IT IS SO ORDERED.

## JUDGMENT

IT IS ORDERED AND ADJUDGED that pursuant to this Court's Memorandum Opinion and Order dated December 30, 1997, granting Petitioner's application for a Writ of Habeas Corpus, the Respondents, GEORGE KILLINGER, Warden of FMC Fort Worth, Fort Worth, Texas; and KENNETH McGINNIS, Director of the Michigan Department of Corrections are hereby ordered to release the Petitioner forthwith.